# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

| | | |
|---|---|---|
| **T.C. ON BEHALF OF HER MINOR CHILD, S.C.,** | ) ) ) | **No. 3:17-CV-1098** |
| **Plaintiff,** | ) ) | **Judge Trauger** |
| **v.** | ) ) | **Magistrate Judge Newbern** |
| **METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, D/B/A METROPOLITAN NASHVILLE PUBLIC SCHOOLS,** | ) ) ) ) ) ) ) | **JURY DEMAND** |
| **Defendant.** | ) ) | |

| | | |
|---|---|---|
| **JOHN DOE AND JANE DOE #1, ON BEHALF OF THEIR MINOR CHILD, JANE DOE #2,** | ) ) ) ) | **No. 3:17-CV-1159** |
| **Plaintiff,** | ) ) | **Judge Trauger** |
| **v.** | ) ) | **Magistrate Judge Newbern** |
| **THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, D/B/A METROPOLITAN NASHVILLE PUBLIC SCHOOLS** | ) ) ) ) ) ) | **JURY DEMAND** |
| **Defendant.** | ) ) | |

1

SALLY DOE, ON BEHALF OF HER ) 
MINOR CHILD, SALLY DOE #2, )
                                  )      No. 3:17-CV-1209

    Plaintiff, )

                                   )      **Judge Trauger**

v.                             )      **Magistrate Judge Newbern**

                                   )

THE METROPOLITAN )      **JURY DEMAND**
GOVERNMENT OF NASHVILLE AND )
DAVIDSON COUNTY, TENNESSEE )
D/B/A METROPOLITAN NASHVILLE )
PUBLIC SCHOOLS, )
                                   )

    Defendant. )

---

MARY DOE #1, ON BEHALF OF HER )
MINOR CHILD, MARY DOE #2, )
                                   )      No. 3:17-CV-1277

    Plaintiff, )

                                   )      **Judge Trauger**

v.                             )      **Magistrate Judge Newbern**

                                   )

THE METROPOLITAN GOVERNMENT )      **JURY DEMAND**
OF NASHVILLE AND DAVIDSON )
COUNTY, D/B/A METROPOLITAN )
NASHVILLE PUBLIC SCHOOLS )
                                   )

    Defendant. )
                                   )

---

{N0203224.2}

| | |
|---|---|
| TOMMY DOE AND TAMMY DOE #1,<br>ON BEHALF OF THEIR MINOR<br>CHILD, TAMMY DOE #2<br><br>　　Plaintiff,<br><br>v.<br><br>METROPOLITAN GOVERNMENT OF<br>NASHVILLE AND DAVIDSON<br>COUNTY, TENNESSEE, D/B/A<br>METROPOLITAN NASHVILLE<br>PUBLIC SCHOOLS,<br><br>　　Defendant. | No. 3:17-CV-1427<br><br>Judge Trauger<br>Magistrate Judge Newbern<br><br>JURY DEMAND |

## JOINT MOTION FOR RESOLUTION OF DISCOVERY ISSUES[1]

The Parties hereby move under Federal Rules of Civil Procedure 26, 30, 31, 33, 34, and 37 and Middle District of Tennessee Local Rule 37.01 for resolution by the Court of the discovery issues outlined in the following joint discovery statement:

**I.**　　**Whether Defendant may discover information concerning the minor children's sexual activity and sexual history under F.R.E. 412.**

　　**A.**　　**Plaintiff's position:**

Plaintiff seeks a protective order requiring that Defendant be barred from inquiring into the Plaintiffs' sexual behavioral history. During the Deposition of Sally Doe #1, the mother of the minor victim, Sally Doe #2, defense began a line of questioning inquiring into the sexual history of both the victim and the victim's mother. (See Deposition excerpts, attached, EXH. A, pp. 28 to 34). Thereafter, Defense counsel shared with Plaintiff's counsel that he intended to

---

[1] The Parties request that the Court accept this filing as both a Motion and a memorandum of law in support of the Parties' positions.

Case 3:17-cv-01209　　Document 33　　Filed 05/02/18　　Page 3 of 26 PageID #: 248

make comparable inquiries into the victim's sexual activity both prior and subsequent to the events at issue.

Federal Rule of Evidence 412 prohibits the admission of evidence of a victim's prior sexual behavior or sexual predisposition in a civil case unless the court determines that "its probative value substantially outweighs the danger of harm to any victim and of unfair prejudice to any party." Fed. R. Evid. 412. The Advisory Comment to Rule 412 states:

> In order not to undermine the rationale of Rule 412, however, courts should enter appropriate orders pursuant to Fed. R. Civ. P. 26(c) to protect the victim against unwarranted inquiries and to ensure confidentiality. Courts should presumptively issue protective orders barring discovery unless the party seeking discovery makes a showing that the evidence sought to be discovered would be relevant under the facts and theories of the particular case, and cannot be obtained except through discovery.

Fed. R. Evid. 412. Advisory Committee Notes, Subdivision (c).

Courts have applied this reasoning to sexual harassment cases in the Title IV context, as well as in the Title IX context, and have held that Rule 412 is applicable in resolving discovery disputes regarding a victim's past sexual behavior. *See Gibbons v. Food Lion, Inc.*, No. 98-1197-CIV-T-23F, 1999 WL 33226474, at *2 (M.D. Fla. Feb. 19, 1999) (noting that the majority of courts addressing the issue have found that Rule 412 has significance in the resolution of discovery disputes); *Rhodes v. Motion Indus., Inc.*, No. 1:07-CV-251, 2008 WL 4646110, at *4 (E.D. Tenn. Oct. 17, 2008) ("Rule 412, including its burden-shifting component, has been imported into the discovery context."); *Barta v. City & Cty. of Honolulu*, 169 F.R.D. 132, 135 (D. Haw. 1996) ("In recognition of the policy rationale for Rule 412, the court must impose certain restrictions on discovery to preclude inquiry into areas which will clearly fail to satisfy the balancing test of Rule 412(b)(2) . . .").

Accordingly, courts have entered protective orders curtailing discovery into a victim's

sexual history unless squarely relevant to the matter at issue. *See Barta,* 169 F.R.D. at 135 (evidence as to employee victim's sexual conduct while she was off-duty, outside work place, and which did not involve conduct with named defendants was protected from discovery); *Doe v. Willits Unified Sch. Dist.,* 2010 WL 2524587, at *3 (N.D. Cal. June 23, 2010) (questioning of student plaintiff regarding sexual activity with others not allowed where defendants did not identify any theory under which such questioning would be relevant to claims or defenses); *Gibbons*, 1999 WL 33226474, at *3 (discovery related to employee plaintiff's sexual relationships with persons who had never been employed by the defendant prohibited as irrelevant and would serve only to harass, embarrass, and annoy the plaintiff).

This protective order is necessary to protect this very fragile Plaintiff, who is undergoing psychological treatment for the conduct that is the subject of this cause of action and is particularly vulnerable to the painful invasion of her privacy.

Counsel allowed the defense attorney to query the mother beyond what should be permitted in this situation to see what they would ask her daughter, and now seeks this Protective Order to avoid further prohibited inquiry by the Defendant.

### B.    Defendant's response:

Rule 26 defines the scope of discoverable information in a civil lawsuit: "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." FED. R. CIV. P. 26. Information within this scope of discovery need not be admissible in evidence to be

discoverable. Id.

Conversely, F.R.E. 412 is an evidentiary rule controlling admissibility rather than discoverability. Rhodes, 2008 WL 4646110, at \*4; Barta, 169 F.R.D. at 135. While Rule 412 does not explicitly apply to discovery, several courts have held that it is "applicable and has significance in deciding" certain discovery motions. Rhodes, 2008 WL 4646110, at \*3. As the Advisory Committee Notes above states, orders should bar discovery "unless the party seeking discovery makes a showing that the evidence sought to be discovered would be relevant under the facts and theories of the particular case, and cannot be obtained except through discovery." This burden of proof is easily met.

Metro can demonstrate that the topics sought in discovery are relevant and cannot be obtained other than through discovery. First, there is no allegation that the discovery topics are privileged. Second, they are extremely relevant to the defending the claims Plaintiff has put at issue. Plaintiff has put her sexual history at issue in this case by alleging (1) that the sexual contact and videotaping between her and another student was "unwanted" and "pressured" (Compl. at ¶ 18); (2) that she suffers from physical trauma as the result of this incident (Compl. at ¶ 59); and (3) that she suffers from emotional trauma as the result of this incident (Compl. at ¶¶ 59-60). Third, the issues at stake are critical to this case, since a finding that the conduct was not unwanted could absolve Metro of all liability. Fourth, the amount in controversy is high. Plaintiff values this case at three million dollars. Opposing counsel has stated to the Court that they may present expert testimony regarding the effect of harassment on the adolescent brain. Fifth, Metro does not have access to this information except through Sally Doe #1 and Sally Doe #2. Sixth, Plaintiff is alleging ongoing harassment as a result of the relevant incident; however, Metro has a right to discover if other incidents might also contribute or cause any alleged

harassment.

Allegations of this nature require a specific need for information that would not need to be obtained in a different kind of lawsuit, and here Metro has a right to defend itself against allegations of a sexual nature with discovery that is necessarily sexual in nature. What experience, if any, Sally Doe #2 has with sex and her education about sex will inform the jury's determination of whether the sexual conduct in this case and the resulting videotaping were "unwanted." Those questions will shape Metro's liability. Moreover, by alleging physical and emotional sexual trauma and developmental disorders creating damages of three million dollars, Plaintiff has placed all of these same discovery topics in play. This is not a "garden-variety" pain and humiliation claim. Plaintiff is suggesting that she will not develop into a healthy adult because of unwanted sexual activity. That kind of allegation puts Metro in the position where it will need to ask personal questions to see how Sally Doe has developed sexually to this point in her life. Moreover, none of this information can be obtained except through discovery inquiries to the girl and her parent.

Courts routinely hold that evidence of previous sexual experience is relevant to a claim of unwelcome sexual contact or damages for emotional distress. In the Title VII context, the Sixth Circuit has repeatedly found that a plaintiff's sexual behavior in the public workplace is relevant to sexual harassment and hostile work environment claims because it is probative as to whether the alleged conduct was unwelcome. Savage v. City of Lewisburg, Tenn., No. 1:10-0120, 2014 WL 5089940, at *2 (M.D. Tenn. Oct. 9, 2014) (collecting cases). The analogous context for a Title IX unwelcome sexual contact allegation is the plaintiff-student's previous sexual contacts at school or with her peers. In Rhodes, a case cited by Plaintiff, the Court held that defendants were entitled to admit evidence of childhood and adolescent abuse history as it applied to causation

against claims for compensatory damages for emotional distress. <u>Rhodes</u>, 2008 WL 4646110, at *5-*6. Certainly, if sex abuse history was determined to be ***admissible***, then it certainly meets the reduced threshold of being ***discoverable*** in this case.

Finally, Metro asks the Court to disregard opposing counsel's allegations that Sally Doe #2 is fragile and seeking psychological treatment without any record proof to support them. Metro contests both allegations. While Metro accepts that these questions are not easy to answer for any sixteen-year old girl, Sally Doe #2 has come forward with these explicitly and sexual allegations already in a public lawsuit. A necessary prerequisite to bringing this suit is the ability to provide information to allow the opposing party to defend against those assertions at trial, which is what Metro is seeking through discovery.

## II. Whether Defendant may discover information, and the extent of this inquiry concerning Plaintiffs' parent's employment, health, and financial history.

### A. Plaintiff's position:

During the deposition of Sally Doe #1, the mother of the minor victim, Sally Doe #2, defense began a line of questioning inquiring into the financial health and business history of the mother. (See Deposition excerpts, attached, EXH. B, pp. 14 to 24). Plaintiff is merely a Plaintiff, due to the fact that her daughter is a minor and she is bringing the case on her child's' behalf. The mother has no independent claims of her own, and her business history nor her current financial situation, bear even a remote relationship to the facts in this case nor claims of the victim. The Court should safeguard the mother's privacy rights regarding her personal financial affairs. The fact that she may have a high income as well as other business interests is no more an element of the case than if she were destitute. Plaintiff seeks a protective order, protecting the

privacy rights of Sally Doe #1's financial and business information, since it is wholly irrelevant, and not likely to lead to any relevant information, in this case.

### B.     Defendant's response:

Metro's requests for employment and financial health information from Sally Doe #1 are satisfied under Rule 26. First, although this is a derivative claim, the employment and financial history of the guardians of minor children is incredibly relevant to their motivation for bringing claims on their children's behalf. To pretend that Sally Doe #1 has no financial stake in a lawsuit involving her daughter is disingenuous. The financial health of the guardian is the financial health of the minor. Additionally, the financial standing of Sally Doe #1, is also relevant to the issue of Sally Doe #2's mental health and development. As Plaintiffs' counsel has stated an intent to produce an expert concerning Sally Doe #2's development, it is imperative Metro have a comparable scope of information that may have had an effect on Sally Doe's development. To suggest that a parent's financial health and standing has no bearing on a child's development is to suggest Sally Doe #2 grew up in a vacuum. As such, Metro is entitled to inquire about Sally Doe #2's financial health and history.

The requests also meet the other standards of Rule 26. It seeks nonprivileged matter. Asking for financial records is proportional to the needs of the case especially considering that the amount in controversy is three million dollars. Metro does not have the ability to access Sally Doe #1's tax records, and these records should be in her possession and capable of being turned over without difficulty. Certainly, she is not prejudiced to answer questions about her employment history and the financial health of her business.

Accordingly, Metro seeks production of information objected to in response to Sally Doe

Interrogatories #2 and #4 and Request for Production of Documents #5, #7, and #8, responses of which are attached as Defense Exhibit #1. Additionally, Metro requests that the Court permit Metro to reopen the deposition of Sally Doe #1 that opposing counsel refused to allow her to answer regarding her personal financial health and the financial health of her business. (See Ex. B at 20:13-24:5.)

**III.    Whether Defendant must produce discovery requests seeking MNPS and MNPD records of investigative files into incidents involving sexual misconduct.**

###    A.    Plaintiff's position:

Plaintiff seeks records responsive to Plaintiff's Second Set of Requests for Production of Documents that requests investigative files and disciplinary records for events involving sexual harassment, sexual pictures and videos, and other inappropriate sexual behavior that occurred at Defendant's secondary schools, all of which is directly relevant to the matter at issue. An element of Plaintiff's claim requires Plaintiff to establish that the Defendant acted with deliberate indifference to harassment by responding in a clearly unreasonable manner in light of the known circumstances. *See Davis v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 640 (1999). In defining the "clearly unreasonable" standard, the Sixth Circuit has explained, "where a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior. Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances." *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000). Accordingly, past incidents of sexual harassment and the school district's response thereto is

directly relevant to Plaintiff's claims, and discovery should be permitted.

Defendant has provided a computer-generated list of incidents, purportedly inclusive of all discipline that occurred involving sexual harassment, inappropriate sexual behavior and, inappropriate sexual contact that occurred on school premises, all of which was located pursuant to a key word search by the defense. The list that was provided to Plaintiff omits five students that were punished in the T.C. v. Metro case, #3:17-cv-01098 who posted a sexual video of T.C. (another Title IX case against this Defendant). These five students were punished pursuant to Code 413, which is the code designation for "extreme disruption of school activity."[2] Witnesses for defendant, including the current and former Title IX Coordinators have admitted that they would not recognize this as activity that could involve sexual harassment due to this coding. Ms. Dyer the current Title IX Coordinator testified that as a result they cannot determine how many incidents of sexting or sexual videos were filmed or exchanged. Dyer also testified she could not fashion a remedy if she did not know these incidents were occurring. (See Deposition excerpt of Phyllis Dyer, current Title IX Coordinator, attached EXH. C, pp 11 to 12, 74 to 77, and 125 to 133.) Ms. McCargar, former Title IX Coordinator until July 2001, also testified that she was not aware of any sexting or sexual videos in the schools and therefore she took no action. (See Deposition excerpt of Julie McCargar, former Title IX Coordinator, attached EXH. D, pp 8, 18, 121 to 125, 136 to 139, and 142 to 143). Defense counsel was made aware of this problem and Plaintiff submitted a second Request for Production, requesting incidents of sexual videos and sexting be produced no matter how the activity was coded. Defendant first asked for an extension because it would be voluminous. Defense counsel now argues it is irrelevant. (See Plaintiffs Second Set of Interrogatories and Request for Production, Defendant's Response, and

---

[2] The parties for the purposes on this motion stipulate these five students were disciplined under Code 413 "extreme disruption of school activity."

Defendants request for an extension due to the voluminous nature of the response attached collective EXH. E).

### B. Defendant's response:

Plaintiff contends that her own sexual history is irrelevant and should not be discoverable under Rule 412 but believes that the sexual history of the other 86,000 students at MNPS are relevant. First, Metro wishes to correct a few inaccuracies as to how this issue has been presented. Contrary to counsel's statement, Plaintiff originally did not seek instances of sexual ***misconduct*** at school. She sought to learn of all instance of sexual ***conduct*** at Hunters Lane High School and MNPS, overall. (Def. Ex. #2, Metro's Responses to Plaintiff's Initial Discovery Requests at Interrogatory #13 & #18.) Metro responded with a list of all instances that were coded under five sexual categories, including a statement that these do not necessarily represent all instances of sexual conduct. (Id.) The lists numbered in the thousands, as one would expect from a student body so large over five years. These lists did not disclose the names of the minor students or the events that took place, as that information was irrelevant and the production of it would require FERPA notices numbering into the thousands.

Plaintiff then followed up with a request for all investigative files and discipline for these instances of sexual conduct as well as any instances of sexual misconduct, however they are coded at MNPS. (Metro's Responses to Plaintiff's Second Discovery Requests at RFP #1, 2, 3, and 5.) Metro responded that production of this information was irrelevant, overly broad, and unduly burdensome. (Id.) Metro explained that in order to pull every instance of sexual misconduct, every disciplinary incident in the past five years at every MNPS school would have to be pulled and individually reviewed. This is necessary because incidents involving sex can be coded in a variety of ways. (See Def. Ex. #3, 2016-17 MNPS Handbook at TCMG000416-428

describing dozens of codes for discipline.) Indeed, looking at pornography on a cell phone may be coded as Inappropriate Use of a Cell Phone or Extreme Disruption of School Activity, which is not a category that necessarily implicates sexual activity—a problem that Plaintiff herself recognizes above. (See Def. Ex. #4, Transcript of Dr. Susan Kessler's Deposition at 83:14-84:5.) Disciplinary files are not centrally located, so collecting these files for production would involve going to more than a hundred schools to collect the files. Once they were collected, someone would have to review each one and determine whether it met Plaintiff's definition of "sexual misconduct," which will take months.

Once they are collected and reviewed, MNPS would have to distribute them to Plaintiff in accordance with the miscellaneous provisions of Tenn. Code Ann §§ 10-7-504(a)(1)(4)(A), (G), (l)(1) and (t)(1) as well as 20 U.S.C. §§ 1232(b) (FERPA). MNPS would either have to (1) send out FERPA notices to each victim, perpetrator, and each and every witness, which could number into the thousands, any number of which could be challenged in Court by a concerned parent or (2) redact each file and edit each video to prevent anyone reviewing it from being able to directly or indirectly identify personal information about each person involved. See 34 C.F.R. § 99.3 (citing 20 U.S.C. § 1232(g)).

The most important reason for denying this request, however, is because Plaintiff has not identified a basis for relevance for this information. First, she contends that if Metro had notice that its discipline was ineffective to curb harassment then it was under an obligation to do more. The Vance case she cites, however, does not stand for the proposition that a plaintiff is entitled to discover unrelated incidents of sexual misconduct. That case addressed whether evidence of previous sexual misconduct at school *against the same plaintiff* could be relevant to determining whether the school's previous remedial actions were so ineffective to curb harassment against

that plaintiff so as to constitute deliberate indifference. It is a logical leap to suggest that this language justifies combing through the records of MNPS to determine how sexual misconduct is addressed in unrelated instances.

She also contends that there is evidence that the Title IX coordinator was not notified of certain instances of sexual misconduct, but Plaintiff has provided no authority to show that notification to the Title IX coordinator is an element of her deliberate indifference claim. To prove a case of Title IX harassment, a plaintiff must show (1) the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school; (2) the funding recipient had actual knowledge of the sexual harassment, and; (3) the funding recipient was deliberately indifferent to the harassment. Vance v. Spencer Cty. Pub. Sch. Dist., 231 F.3d 253, 258–59 (6th Cir. 2000) Investigation and discipline for all actions, both sexual and nonsexual, is handled at the school level. See Def. Ex. #5, MNPS SP 6.110 at TCMG000331-332 ("Bullying, Cyber Bullying, Discrimination, Intimidation, Harassment, and Hazing") (describing how investigation and remedies are performed by the principal or principal designee). Notification to the central office Title IX coordinator does not implicate whether MNPS is liable for deliberate indifference.

Plaintiff's attorneys also allege in this Joint Statement that she should be entitled to MNPD records of juveniles that have reported sexual misconduct as well as MNPS records. First, as Plaintiff has pointed out numerous times, the crux of a Title IX lawsuit is a school system's investigation, not the investigation carried out by law enforcement. Accordingly, the police records are of instances of sexual misconduct at schools unrelated to Sally Doe #2 are even more irrelevant than MNPS investigative files of these incidents.

Second, Metro does not have the authority to produce juvenile law enforcement or court records by means of a discovery request. Juvenile Court records must be petitioned to the Juvenile Court for Nashville & Davidson County pursuant to Tenn. Code Ann. § 37-1-153 and 154; State v. Harris, 30 S.W.3d 345, 351, 1999 Tenn. Crim. App. LEXIS 1072, *14 (holding that the appropriate court with jurisdiction to hear such a request is solely the Juvenile Court for Nashville & Davidson County). There are additional protections for reports of known or suspected child abuse under state law, which could be encompassed in the state records. See, e.g Tenn. Code Ann. §§ 37-1-605, 612 and 37-1-403.

Third, the request is unduly burdensome. The school investigation is separate from the police investigation. Accordingly, there is no connection between the records, so all juvenile court police records would have to be searched individually to see what matched the accompanying school records. This is an additional search that would need to be performed after the above mentioned school records search to find MNPD case matches.

### C. Plaintiffs Reply:

Defendant has denied that they had any prior knowledge of sexting or sexual videos occurring in the Metro school system. See answer in Sally Doe case document 11 paragraphs 13 and 14. Attached EXH. G. Defendant seeks to prevent plaintiffs from showing the jury that they did know these activities were occurring and they took insufficient measures to address and prevent these activities from reoccurring. This is not a fishing expedition as testimony from SRO Boone and Detective Carrigan have already established that this type of activity was occurring in the Nashville school system. Officer Boone testified he was the SRO officer from Hunters Lane High School and he was aware of approximately 12 instances of sexting that occurred in the last five years and approximately 5 to 10 instances of a sexual video in the same timeframe.

Detective Carrigan testified that this was a systemwide problem involving every school in the district. Depo. Excerpts of Boone and Carrigan attached as EXH H. Defendant cannot deny they knew of this activity and simultaneously refuse to provide the documentation to show that they did know of this activity.

**IV.    Whether the Defendant is entitled to Plaintiffs' social media accounts.**

**A.    Plaintiff's position:** Defendant seeks Plaintiffs' social media usernames and passwords and Plaintiffs maintains that the discovery request is overbroad and unduly burdensome. Defendant is merely speculating that there might be relevant information in the private sections of Plaintiffs' social media sites, but they have offered no evidence or other reason to back up that speculation.  Although the relevant information in private sections of a social media account may be discoverable, as it is not privileged nor likely protected from production by a common law right of privacy; nonetheless, the Defendant has no right to serve overbroad discovery requests that seek irrelevant information. *Glazer,* above; *Tompkins,* 278 F.R.D. at 389.  *Howell v. Buckeye Ranch, Inc.,* 2:11-cv-01014-GLF-MRA Doc #: 32 (U.S. Dist. Ct., So. Dist. Ohio, filed 10/01/12).

Defendant's discovery request is overbroad. Plaintiffs' usernames and passwords would gain defendant access to all the information in the private sections of any social media accounts, whether they are relevant or not. Defendant has served interrogatories and document requests that seek information from the accounts that is relevant to the claims and defenses in this lawsuit. Plaintiff's counsel will consult with their clients to comply with the production of all relevant information on social media accounts and provide the information and documents responsive to the discovery requests.  The Court in the *Howell* case (cited above), upon request

of the Defendant to obtain the social media username and password in a sexual harassment case, held as follows: "Here defendants' discovery request is overbroad. Howell's username and password would gain defendants access to all the information in the private sections of her social media accounts–relevant and irrelevant alike. The fact that the information defendants seek is in an electronic file as opposed to a file cabinet does not give them the right to rummage through the entire file. The same rules that govern the discovery of information in hard copy documents apply to electronic files."

This Court has authority to issue protective orders for good cause in order to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). Good cause exists in the case at bar because Plaintiff's fundamental right to privacy is at issue and where the discovery sought is social media content, such as Facebook data, Courts impose the requirement that the party seeking this discovery meet a threshold showing that the public information on the website undermines Plaintiffs' claims. While Courts have acknowledged the potential relevancy of Facebook data in personal injury litigation, in order to balance a plaintiff's right to privacy with a defendant's need for discovery to defend against damages claims, Courts have required that a defendant first make a threshold showing that public information on a plaintiff's Facebook page undermines the plaintiff's claims. *Keller v. Nat'l Farmers Union Prop. & Cas.*, 2013 U.S. Dist. LEXIS 452, 11-12 (D. Mont. Jan. 2, 2013); *See e.g.*, *Thompson v. Autoliv ASP, Inc.*, 2012 U.S. Dist. LEXIS 85143, 2012 WL 2342928 *4 (D. Nev. June 20, 2012) (allowing discovery where material obtained by defendant from plaintiff's public Facebook account negated her allegations that her social networking site accounts were irrelevant); *Tompkins v. Detroit Metropolitan Airport*, 278 F.R.D. 387, 388-89 (E.D. Mich. 2012) (denying discovery as overly broad where publicly available

information was not inconsistent with the plaintiff's claims); *McMillen v. Hummingbird Speedway, Inc.*, 2010 Pa. Dist. & Cnty. Dec. LEXIS 270, 2010 WL 4403285 (Pa. Com. Pl. Sept. 9, 2010); *Zimmerman v. Weis Markets, Inc.,* 2011 Pa. Dist. & Cnty. Dec. LEXIS 187, 2011 WL 2065410 (Pa. Com. Pl. May 19, 2011).

Courts requiring such a showing do so, at least in part, to guard against the "proverbial fishing expedition." *Tompkins*, 278 F.R.D. at 388. As the Tompkins court explained it, a "[d]efendant does not have a generalized right to rummage at will through information that [p]laintiff has limited from public view." *Tompkins*, 278 F.R.D. at 388. Absent some "threshold showing that the requested information is reasonably calculated to lead to the discovery of admissible evidence," a "[d]efendant would be allowed to engage in the proverbial fishing expedition, in the hope that there might be something of relevance in [p]laintiff's Facebook account." *Tompkins*, 278 F.R.D. at 388. Courts have acknowledged that "[p]ostings on Facebook and other social media present a unique challenge for courts, due to their relative novelty and their ability to be shared by or with someone besides the original poster." *Higgins v. Koch Dev. Corp.*, 2013 U.S. Dist. LEXIS 94139, 4-5 (S.D. Ind. July 5, 2013). Nonetheless, the information is discoverable if the party seeking disclosure satisfies the FRCP 26 mandate of relevancy. *Id*. ("A court may compel production of a party's Facebook information if the party seeking disclosure makes a threshold relevance showing"); *see also Equal Emp't Opportunity Comm'n v. Simply Storage Mgmt.*, LLC, 270 F.R.D. 430, 434-35 (S.D. Ind. 2010) ("EEOC"); *see also Potts v. Dollar Tree Stores, Inc.*, 2013 U.S. Dist. LEXIS 38795, 2013 WL 1176504 (M.D. Tenn. Mar. 20, 2013); *Tompkins v. Detroit Metro. Airport*, 278 F.R.D. 387, 388 (E.D. Mich. 2012).

To that end, a plaintiff's Facebook page can contain a myriad of information unrelated

to evidence that would undermine the claims of physical injuries. Postings of children and other family members and tags of friends and family bear no relevance to a plaintiff's claim for physical injuries and fall outside the scope of discovery. In *Offenback v. L.M. Bowman*, Inc., the defendants argued that the plaintiff's Facebook and MySpace accounts were relevant to his claim that he suffered physical and psychological injuries as a result of a vehicular accident. *Offenback v. L.M. Bowman*, No. 10-CV-1789, 2011 U.S. Dist. LEXIS 66432, at *1 (M.D. Pa. June 22, 2011). Specifically, the defendants argued that the plaintiff's "social activities, transportation related activities, and expressions of emotion [were] relevant." *Id*. The court conducted an *in camera review* and determined that while certain posts reflecting that the plaintiff rode a motorcycle, possibly rode a mule, and hunted after the alleged accident were relevant, the remainder of the postings were not. *Offenback,* 2011 U.S. Dist. LEXIS 66432, at *2-3.

The *Higgins* Court similarly found that limits must be placed on what a defendant may discover from a plaintiff's Facebook page. In that case, the Plaintiffs objected to the Defendant's discovery request for all Facebook data as overly broad and argued that the request should be limited "to those posts, comments, etc [sic] and photographs that are relevant and related to Plaintiffs' claims of lung and respiratory problems from the date of the incident[,] June 20, 2009[,] to the date of the archive[,] April 29, 2013." The Court agreed and limited the production of Facebook data in accordance with the plaintiffs' injuries and date of incident. *See Higgins v. Koch Dev. Corp.*, 2013 U.S. Dist. LEXIS 94139, 8-9 (S.D. Ind. July 5, 2013).

Defendant is not entitled to **all** of Plaintiffs' Facebook information as requested. *See EEOC v. Simply Storage Mgmt.*, 270 F.R.D. 430, 435 (D. Conn. 2009); *McCann v. Harleysville Ins. Co. of New York*, 78 A.D. 3d 1524, 1525 (N.Y. App. Div. 2010) (defendant

"failed to establish a factual predicate with respect to the relevancy of the evidence," finding that "defendant essentially sought permission to conduct 'a fishing expedition' into plaintiff's Facebook account based on the mere hope of finding relevant evidence."); *Fawcett v Altieri*, 38 Misc. 3d 1022 (N.Y. Sup. Ct. 2013) ("The party requesting the discovery of an adversary's restricted social media accounts should first demonstrate a good faith basis to make the request.")

Defendant has shown nothing to indicate its request is anything other than a fishing expedition and a protective order should be granted.

### B. Defendant's response:

This issue has been presented inaccurately. First, Metro's discovery requests did not request **passwords** for their social media accounts, as plaintiff alleges. (See Def. Ex. #6 Metro's Second Set of Discovery Requests to Plaintiffs.) The requests were for social media platforms and **usernames**, as well as information on the accounts that related to contacts with the accused, contacts with her current boyfriend (who is a witness to her alleged harassment), posts in which plaintiffs refer to any injuries, harassment, threats, or distribution of the video that is the subject of this case. Metro also requested all pictures or videos taken since the beginning of the calendar year in which the incident occurred. These pictures will assist the jury in determining Sally Doe #2's emotional state before and after the incident. Finally, Metro requested a downloaded copy of the social media accounts.

Second, these requests are far from a fishing expedition. Sally Doe #2's mental state is a critical issue to this case. She is alleging three million dollars in physical and emotional harm. And there is no better way for a jury to ascertain her allegations of physical and emotional well-

being than through her social media posts. Sally Doe #1 alleges that because of the video, her daughter is socially withdrawn and is being harassed into fights at school related to social media. (Def. Ex. #7, Sally Doe #1 Dep. at 113:18-114:10, 152:10-153:15.) Meanwhile, Sally Doe #2's medical records show that in January of 2017, a few months prior to the incident, she had poor peer-to-peer relations, has problems with drama on social media, that she was diagnosed with a mental health disorder, and that she had to transfer schools because of fighting. Def. Ex. #8, Sally Doe #2 Medical Records at pg. 5-6, 11; see also Def. Ex. #9, Sally Doe #1 MNPS Record at S. DOE MG000069 (MNPS records show that during this same time period she engaged in two fights). The dissonance between Sally Doe #1's testimony and the factual record in this case is sufficient to justify a full review of Plaintiffs' social media accounts to determine the truth.

If Plaintiff's only concern is with production of the social media profiles (Request for Production of Documents #30), Metro can agree to only receive access to these profiles after an *in camera* inspection (as was done in the Offenback case Plaintiff cites to) to disclose information related physical and emotional health, fighting, alleged harassment, reference to the video in question, and posts related to her sexual and video history, should any exist. But Metro is certainly entitled to full production of its other social media requests.


  **V. Whether Plaintiff's counsel may direct his client not to answer questions on the basis of relevancy.**

  **A. Defendant's position:** During the deposition of Sally Doe #1, Metro's counsel asked her two questions above related to her financial records and financial well-being. Before Sally Doe #1 was able to answer these questions, Plaintiff's counsel instructed her not to answer on the basis of a relevancy objection. See Ex. B, Sally Doe #1 Dep. at 20:13-24:5.

Plaintiff's counsel was asked whether he was asserting a privilege and he claimed that this was not necessary. These are the only two questions—and any necessary follow-up questions—that Metro is seeking to have answered that were not answered during the deposition.

The Federal Rules of Civil Procedure and the Tennessee Rules of Professional Conduct prohibit an attorney from instructing a client not to answer questions during a deposition on the basis of a relevancy objection. Under F.R.C.P. 30(c)(2), "[a] person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)." Additionally, under Rule 3.4 of the Tennessee Rules of Professional Conduct, "[a] lawyer shall not . . . unlawfully obstruct another party's access to evidence or unlawfully alter, destroy, or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act."

Numerous federal courts have held that absent a claim of privilege, it is inappropriate to instruct a witness not to answer a question on the basis of relevance. Resolution Tr. Corp. v. Dabney, 73 F.3d 262, 266 (10th Cir. 1995); Ralston Purina Co. v. McFarland, 550 F.2d 967, 973 (4th Cir. 1977) ("The action of plaintiff's counsel in directing [the witness] not to answer the questions posed to him was indefensible and utterly at variance with the discovery provisions of the Federal Rules of Civil Procedure."); Hearst/ABC-Viacom Entm't Servs. v. Goodway Mktg., Inc., 145 F.R.D. 59, 63 (E.D. Pa. 1992) ("The action of defense counsel in directing [the witness] not to answer certain questions on the ground that they were irrelevant was clearly inappropriate."); Lloyd v. Cessna Aircraft Co., 74 F.R.D. 518, 520 (E.D. Tenn. 1977) (quoting Drew v. International Bro. of Sulphite & Paper Mill Wkrs., D.C.D.C. (1965), 37 F.R.D. 446, 449-450(6))("(A)n objection (at a deposition on the ground of relevancy) does not warrant a

refusal to answer the questions."); <u>see also</u> Wright & Miller, Federal Practice and Procedure: Civil s 2113, at 419 n.22 (1970).

In this case, Plaintiff's counsel did not have the right to direct his client not to answer these questions. He did not assert any privilege that would allow him to instruct the witness not to answer these questions, nor was there a court order in place that would shield the client from the responsibility to answer those questions. If Plaintiff's counsel believed that a question or line of questioning is wholly improper, his remedy was to stop the deposition and ask for a protective order. See <u>First Tennessee Bank v. Fed. Deposit Ins. Corp.</u>, 108 F.R.D. 640, 641 (E.D. Tenn. 1985).

For the reasons described above, the financial health of Ms. Toms and her business is relevant to the reasons why her lawsuit was brought. Accordingly, Metro seeks (1) to be allowed to reopen Ms. Toms' deposition to answer the two questions we attempted to ask and any necessary follow up questions and (2) a direction from the Court that if this issue arises in the future that Plaintiff's counsel be required to call the Court and seek a protective order during the deposition or to allow his client's to answer the questions.

### B.    Plaintiff's response:

Plaintiff has no dispute with the law cited by Defendant on this issue.  The issue was whether to stop the deposition or reserve certain questions for the court to address.

The deposition in question (Sally Doe #1 excerpts, previously attached as EXH. B), demonstrates that the deposition continued on assent of both parties until conclusion, but for the issue objected to in II A., hereinabove. Defense counsel asked numerous questions about the income of the mother of Sally Doe. These questions were not relevant and could not lead to relevant evidence but were permitted by Plaintiff's counsel in order to move the deposition

forward. Eventually, Plaintiff's counsel stepped in to stop the inappropriate line of questioning. Either party could have stopped the deposition and insisted upon taking the issue up with the Court before continuing. Neither stopped the deposition and now the issue is before the Court for consideration. Plaintiff's counsel also instructed the mother the mother that she did not have to answer if she had an abortion in 2001. This question is not relevant and is also an invasion of the mother's privacy. (See Deposition excerpt, attached Exhibit F, p. 26.) Plaintiff asserts that, in the event that the Court believes the objection was valid, then a protective order should be issued. If the Court believes that the inquiry is relevant, then the deposition needs to resume with the Court providing guidance on limitations regarding the finances of the parents, and/or how a pregnancy was lost.

### C. Defendant's Reply:

As opposing counsel is well aware, in Metro's communications with counsel Metro only has requested to reopen the deposition to ask about Sally Doe #1's ***financial*** health, questions which counsel blocked his client from answering during the deposition before the personal health question he raises above. Metro hasn't requested to ask the above question about her health. However, since counsel raised the issue, a response is justified.

Undersigned counsel was not seeking information about whether she went through an abortion, but instead about whether she had any children that were no longer living or rather died *in utero*. If Sally Doe #2 was aware of her mother's previous pregnancies or if she once had a brother or sister who was no longer living, and if these pregnancies occurred when Sally Doe #1 was of high school age, then Sally Doe #2's attitude toward sex in high school would be affected by that, which could inform the jury as whether the sexual contact at issue in this case was unwanted, as Plaintiffs claim. Admittedly, the question came out poorly, it was not repeated, and

undersigned counsel wishes he would have asked instead the question he intended to ask, which was whether there were any other pregnancies. Counsel agrees that how a pregnancy terminates is irrelevant and that question will not be asked in future depositions.

This response from Plaintiff's counsel is an attempt to detract from the point of raising this issue, which is to have guidance on what the attorneys should do in the event of future instances where Plaintiff's counsel instructs his client not to answer without a privilege, which Metro hopes the Court will address.

Respectfully submitted,

/s/R. Alex Dickerson
Jeff Campbell, #22455
R. Alex Dickerson #27184
Phylinda Ramsey #29545
Metropolitan Legal Department
PO Box 196300
Nashville, TN 37219
(615) 862-6341
(615) 862-6352 (fax)
Jeff.Campbell2@nashville.gov
Alex.Dickerson@nashville.gov
Phylinda.Ramsey@nashville.gov
*Attorneys for Defendant Metropolitan*
*Government of Nashville and Davidson County*

/s/Stephen Crofford
Stephen Crofford, BPR No. 12039
Mary Parker, BPR No. 6106
Parker and Crofford
1230 2nd Avenue South
Nashville, TN 37210
(615) 244-2445
stephencrofford@msn.com
mparker@parker-crofford.com
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing was served via CM/ECF filing to the following:

Stephen Crofford
Mary Parker
1230 2nd Ave. S.
Nashville, TN 37210
615-244-2445
stephencrofford@msn.com
mparker@parker-crofford.com


on this 2nd day of May, 2018.

/s/R. Alex Dickerson
R. Alex Dickerson
