UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| T.C, ON BEHALF OF HER MINOR CHILD, S.C., <br><br>      Plaintiffs, <br><br> v. <br><br> METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE D/B/A METROPOLITAN NASHVILLE PUBLIC SCHOOLS, <br><br>      Defendant. | Case No. 3:17-CV-01098 <br><br> Judge Aleta A. Trauger <br> Magistrate Judge Newbern |
| JOHN AND JANE DOE #1, ON BEHALF OF THEIR MINOR CHILD, JANE DOE #2, <br><br>      Plaintiffs, <br><br> v. <br><br> METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE D/B/A METROPOLITAN NASHVILLE PUBLIC SCHOOLS, <br><br>      Defendant. | Case No. 3:17-CV-01159 <br><br> Judge Aleta A. Trauger <br> Magistrate Judge Newbern |

| | |
|---|---|
| SALLY DOE, ON BEHALF OF HER MINOR CHILD, SALLY DOE #2,<br><br>    Plaintiffs,<br><br>v.<br><br>METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE D/B/A METROPOLITAN NASHVILLE PUBLIC SCHOOLS,<br><br>    Defendant. | Case No. 3:17-CV-01209<br><br>Judge Aleta A. Trauger<br>Magistrate Judge Newbern |
| MARY DOE #1, ON BEHALF OF HER MINOR CHILD, MARY DOE #2,<br><br>    Plaintiffs,<br><br>v.<br><br>METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE D/B/A METROPOLITAN NASHVILLE PUBLIC SCHOOLS,<br><br>    Defendant. | Case No. 3:17-CV-01277<br><br>Judge Aleta A. Trauger<br>Magistrate Judge Newbern |
| TOMMY DOE AND TAMMY DOE #1, ON BEHALF OF THEIR MINOR CHILD, TAMMY DOE #2,<br><br>    Plaintiffs,<br><br>v.<br><br>METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE D/B/A METROPOLITAN NASHVILLE PUBLIC SCHOOLS,<br><br>    Defendant. | Case No. 3:17-CV-01427<br><br>Judge Aleta A. Trauger<br>Magistrate Judge Newbern |

**<u>MEMORANDUM OPINION</u>**

The plaintiffs in these actions, which are consolidated for purposes of discovery, bring claims alleging that their daughters were subjected to unwanted sexual contact while enrolled as students in the Metropolitan Nashville Public Schools (MNPS), in violation of Title IX of the Education Amendments of 1982, 20 U.S.C. §§ 1681, *et seq.*, and 42 U.S.C. § 1983. Now before the Court are MNPS' motion to take Rule 35 psychiatric examinations of the minor plaintiffs, MNPS' motion for an order authorizing the release of the minor plaintiffs' medical records, the parties' joint motion for resolution of multiple discovery issues, MNPS' motion to expedite a ruling on the discovery issues, and the plaintiffs' supplemental motion for discovery regarding MNPS' contact with student witnesses.

The Magistrate Judge held a hearing on these motions and the parties have filed supplemental briefing. In consideration of the parties' arguments in their filings and in court, and for the reasons that follow, MNPS' motion to take Rule 35 psychiatric examinations is GRANTED, subject to the limitations set out below; MNPS' motion for an order authorizing release of the minor plaintiffs' medical records is GRANTED IN PART AND DENIED IN PART; the plaintiffs' supplemental motion for discovery regarding MNPS' contact with student witnesses is DENIED WITHOUT PREJUDICE to renewal; the parties' joint motion for resolution of multiple discovery issues is GRANTED IN PART AND DENIED IN PART, as discussed below; and MNPS' motion to expedite a ruling on the discovery issues is FOUND MOOT.

## I. Factual and Procedural Background

### A. Statement of Facts

Plaintiffs T.C., Sally Doe, John and Jane Doe, Mary Doe, and Tommy and Tammy Doe bring five separate lawsuits against MNPS on behalf of their children, alleging violations of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq*., and 42 U.S.C. § 1983. The claims brought by T.C., John and Jane Doe, Sally Doe, and Mary Doe arise from alleged instances of "exposing" at two MNPS schools. The plaintiffs state that exposing is a practice of videoing sex acts without the knowledge of one or more students involved, circulating the videos to other students or on the internet, and deriding the victims as "sluts" or "whores."[1] The plaintiffs allege that the practice of exposing is widespread within MNPS and that officials at the minor plaintiffs' schools were aware that exposing took place in their schools and throughout the MNPS system. Tommy and Tammy Doe's claims address the alleged long-term sexual harassment of their daughter by a MNPS teacher. All plaintiffs allege violations of Title IX and the minor plaintiffs' equal protection rights based on MNPS' failure to train its personnel to handle incidents of sexual harassment and its deliberate indifference to the ongoing sexual harassment of female students.

Specifically, the plaintiffs claim that MNPS did not fulfill its responsibilities under Title IX to prevent discrimination against female students both before and after the alleged incidents of harassment.[2] *See Doe v. Univ. of Tennessee*, 186 F. Supp. 3d 788, 791 (M.D. Tenn. 2016) (setting out theory of "before" and "after" Title IX claims). The plaintiffs' "before" claims allege that MNPS did not adequately train its employees as to what Title IX requires to prevent harassment

---

[1]     The claims brought by John and Jane Doe and Mary Doe arise out of the same incident. T.C. and Sally Doe's claims describe two instances of similar conduct.

[2]     The Title IX cause of action raised in *Tommy Doe* is not stated as "before" and "after" claims, but makes many of the same allegations.

in educational settings or adequately notify students about the protections available to them under the statute. The plaintiffs further allege that, by failing to take appropriate steps to supervise students and curtail "exposing" through disciplinary measures, MNPS created an environment that allowed unwanted sexual harassment to occur. The plaintiffs' "after" claims allege that, once it learned of the incidents of harassment, MNPS did not inform the plaintiffs of the remedies and resources available to them under Title IX, adequately punish the alleged harassers, or implement a plan that would allow the minor plaintiffs to continue as students in the MNPS system without fear of ongoing harassment.

The plaintiffs' § 1983 claims again allege that MNPS did not adequately train its employees to comply with Title IX or to handle incidents of sexual harassment involving students, as evidenced by "the system-wide prevalence of known severe, pervasive, and objectively offensive sexual harassment and bullying" taking place within the schools. The plaintiffs state that this failure to train results from MNPS' deliberate indifference to the rights of female students because the foreseeable consequence of MNPS' failure is a violation of female students' equal protection rights. They further allege that MNPS' inadequate response to the alleged incidents of harassment was also deliberately indifferent to the female students' rights.

The plaintiffs seek damages for physical and emotional injuries, severe humiliation, embarrassment, loss of enjoyment of life, loss of educational opportunity, past and future medical expenses, past and future pain and suffering, and past and future emotional injuries. They also seek punitive damages, injunctive relief requiring MNPS to comply with Title IX, and attorneys' fees.

The facts of each case as alleged in the plaintiffs' complaints or amended complaints and the defendant's answers are summarized below.

## 1. *T.C. v. MNPS*, Case No. 3:17-cv-01098

T.C. alleges that her daughter, S.C., was sexually harassed when she was a 15-year-old ninth-grade student at Hunters Lane High School. T.C. alleges that, on April 17, 2017, S.C. was pulled into an unlocked classroom and subjected to unwelcome sexual contact by a male student while a third student "surreptitiously lurk[ed] in the back of the classroom, unnoticed by S.C." and videoed the incident. T.C. alleges that this assault was planned and was able to take place because the classroom where it occurred was "unsupervised and improperly unlocked."

T.C. states that school administrators at Hunters Lane were "aware that at least three incidences of 'exposing' had occurred within [MNPS before this incident], two of which took place at Hunters Lane High School" and resulted in the female students "being unable to remain in school due to ongoing harassment and bullying." Hunters Lane administrators "became aware of the incident involving S.C. and the recording of the incident as the videotape began circulating on students' phones and on the internet." In response, "[t]he school's administration chose to discipline the male student who participated in the unwelcome sexual activity, the student who recorded and circulated the videotape, as well as the victim, S.C., with a three-day suspension each." The school did not punish any of the students who circulated the video. S.C. did not return to school at Hunters Lane "due to fear and severe emotional distress resulting from multiple threats, harassment, and bullying she received as a result of the circulation of the videotape, as well as the inadequate punishment those responsible had received[.]" S.C. completed her classwork from home. The complaint states that S.C. "is aware that the videotape of the incident continues to circulate in [the MNPS system] and on the internet, causing S.C. severe emotional distress."

T.C. alleges that punishing S.C. for this incident was in violation of Title IX guidance against disciplinary policies that may chill students' reporting of sexual harassment. T.C. further

states that the school administration deferred to a police investigation and did not conduct the independent investigation that Title IX requires. T.C. also alleges that the Hunters Lane administration "was aware that students engaged in inappropriate behavior, including intimate interactions in common areas in the presence of school staff," which she had witnessed when picking S.C. up from school.

MNPS admits that sexual conduct occurred between S.C. and a male student in an unlocked classroom on or about April 17, 2017. MNPS asserts that S.C. was "fully aware" that she was videoed at the time and that the video "demonstrably" shows that the contact was consensual. MNPS denies "that the administration is to assume sexual behavior will necessarily occur because a door is unlocked." According to MNPS, Hunters Lane Principal Dr. Sue Kessler promptly began an investigation of the incident after it was brought to her attention, interviewed all the students whom she could identify as having a role in the incident or distribution of the video, and disciplined them appropriately. MNPS also asserts that school administrators took "reasonable measures within their power to curtail circulation of the video" and that Dr. Kessler was not aware of the alleged practice of exposing before the lawsuit was filed.

2. ***John and Jane Doe v. MNPS***, **Case No. 3:17-cv-01159, and** ***Mary Doe v. MNPS***, **3:17-cv-01277**

John and Jane Doe and Mary Doe allege that their daughters, Jane Doe 2 and Mary Doe 2, were sexually harassed as fourteen-year-old ninth-grade students at Maplewood High School. They state that, on September 21, 2016, the girls were "involved in unwelcome sexual conduct with 18-year-old male students in a stairway at Maplewood High School." This conduct took place after the end of regular classes when the stairway was unsupervised and was videoed by one or more of the male students involved.

The plaintiffs state that Maplewood administrators became aware of the incident when the girls' parents independently went to the school to report it. Mary Doe notified Maplewood's principal and school resource officer that her daughter "had come home with hickeys on her neck and told [her] that she had been involved in sexual activity in the stairway and that the conduct was unwelcome." The administrators "spoke to the Senior male students involved but otherwise failed to provide any assistance" and informed Mary Doe that Mary Doe 2 "could simply return to class the following day." Jane Doe informed the school that the incident had been videoed, but the school did not notify Mary Doe of the video, even though she had asked the school to investigate whether a video existed. Jane Doe 2 was similarly told to return to class. A police report was filed, but the school did not conduct an independent investigation. The plaintiffs allege that the school did not substantially punish any of the male students involved andthat their daughters are suffering continuing emotional distress because the video of the incident still exists on the internet.

MNPS admits that it became aware of the incident involving Jane Doe 2 and Mary Doe 2 when John and Jane Doe and Mary Doe alerted Maplewood authorities, but asserts that the contact involved was consensual. MNPS further asserts that it is not "to assume sexual behavior will necessarily occur because high school students are allowed to interact in unsupervised areas." MNPS admits that Jane Doe 2 withdrew from school in October 2016 but denies that this was due to its actions. MNPS denies that it did not inform Mary Doe of the video after she asked about its existence. MNPS also denies that it did not substantially punish any of the students involved in the incident.

### 3. *Sally Doe v. MNPS*, Case No. 3:17-cv-01209

Sally Doe alleges that her daughter was sexually harassed when she was a fifteen-year-old ninth-grade student at Hunters Lane. Specifically, she alleges that, in late March 2017, her

daughter was "taken into the men's bathroom" and subjected to "unwelcome and/or pressured sexual contact by a male student." The incident allegedly was videoed without Sally Doe 2's knowledge and released to "other students and the public."

Sally Doe notified the Hunters Lane principal and school resource officer of the incident on April 5, 2017. She states that the administrators "failed to provide any assistance and merely suggested that the parents file a police report." Sally Doe alleges that the school did not effectively discipline any of the students involved or conduct an independent investigation after the police report was filed. Sally Doe 2 "was forced to withdraw from school due to the severe harassment and physical threats she received as a result of the circulation of the videotape" and "was unable to complete the semester at Hunters Lane High School due to the failure of the administration to address the safety concerns of her parents." The video allegedly continues to circulate at Hunters Lane and on the internet, causing Sally Doe ongoing emotional distress.

MNPS responds that it is not "legally responsible under Title IX or § 1983 for placing a monitor in every bathroom to ensure that Plaintiff does not enter the bathroom of the opposite sex voluntarily to engage in intimate interactions." MNPS asserts that it conducted a thorough investigation of the incident and determined that Sally Doe 2 "voluntarily entered the boys' bathroom and engaged in consensual kissing with a male student." It denies that further sexual activity occurred, that there was a video of the incident, or that it was aware of any alleged video. MNPS asserts that, "[h]ad it been brought to the attention of school administrators prior to this lawsuit that sexual activity occurred or that there was a videotape of the activity, further investigation and discipline would have been impl[e]mented."

### 4. *Tommy Doe and Tammy Doe v. MNPS*, Case No. 3:17-cv-01427

Tommy and Tammy Doe's action on behalf of their daughter differs from the other four actions in that it alleges that Tammy Doe 2 was sexually harassed by a teacher when she was a fourteen-year-old ninth-grade student at Maplewood High School. The complaint alleges that, in the fall of 2015, another female student asked Tammy Doe 2 to meet with a female teacher. The teacher allegedly asked Tammy Doe 2 if she was a lesbian and made sexually suggestive comments. The two students began spending time in the teacher's classroom after school, with the other student serving as a lookout while the teacher "kissed and touched" Tammy Doe 2 in the locked classroom.

In April 2016, Maplewood administrators contacted Tommy and Tammy Doe and informed them of this conduct. The complaint alleges that Maplewood's Principal Dr. Woodard "partially blamed Tammy Doe 2 for the relationship" and stated that she was "not innocent." Woodard allegedly stated that he intended to remove the teacher but "advised that the incident should be 'swept under the rug' for the benefit of Tammy Doe 2." Tammy Doe 2 was sent home from school for a week and, other than the removal of the teacher, no further action was taken by the Maplewood administration. Tommy Doe and Tammy Doe contacted the Metro Nashville School Board, but did not receive any information about actions taken in response to this incident. They were "given the name of an individual to call at the school system; however, when [they] attempted to reach the named contact, they were told that the individual had retired and was not replaced."

Tammy Doe 2 was subjected to ongoing bullying and harassment arising out of this conduct and the teacher's removal. She has experienced "depression, weight loss, and difficulty completing her schoolwork due to the severe emotional trauma caused by the incident itself and

the subsequent harassment by her peers, which has forced her to seek counseling and treatment." A criminal investigation is pending against the teacher.

MNPS states that it conducted a thorough investigation of these allegations within twenty-four hours of learning them and that the teacher was immediately placed on administrative leave pending the outcome of the investigation. MNPS denies that Dr. Woodard mentioned "sweeping anything under the rug" and further asserts that he issued a memorandum to the MNPS Executive Director of Employee Relations recommending that the teacher be fired. MNPS asserts that Tammy Doe 2 was sent home for a week at her mother's request and that Dr. Woodard offered to transfer Tammy Doe 2 to a school of her choice, but her parents declined.

### B. Procedural History

The parties' joint discovery motion presents issues in four major areas: (1) MNPS' ability to discover information about the minor plaintiffs' sexual history; (2) MNPS' ability to discover information about the parent plaintiffs' employment, health, and finances; (3) the plaintiffs' ability to access MNPS disciplinary files; and (4) MNPS' ability to discover information from the plaintiffs' social media accounts. In addition to the issues raised in the joint motion, MNPS moves to compel the minor plaintiffs to submit to psychiatric examinations under Federal Rule of Civil Procedure 35. MNPS also seeks an order authorizing the disclosure of the minor plaintiffs' medical records. The plaintiffs have filed a supplemental motion seeking additional discovery regarding MNPS' alleged practice of calling student witnesses to the principal's office during the school day and interviewing them regarding the subject of this litigation not in the presence of their parents.

## II. Legal Standard

The scope of discovery is "within the sound discretion of the trial court." *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 451 (6th Cir. 2008) (quoting *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1240 (6th Cir. 1981)). As a general matter, Federal Rule of Civil Procedure 26 allows discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1) (2017). If a party fails to provide a proper or complete response, Rule 37 authorizes the filing of a motion to compel the discovery. Fed. R. Civ. P. 37(a). Conversely, Rule 26(c) provides for the issuance of a protective order limiting discovery upon a finding of good cause that such an order is necessary to protect a party from "annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1).

The starting point for both inquiries is whether the requested discovery is relevant to the subject matter of the litigation. Relevance for purposes of discovery is broadly construed, and the information sought need not be admissible to be discoverable. Fed. R. Civ. P. 26(b)(1). However, the "desire to allow broad discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant." *Scales v. J.C. Bradford and Co.*, 925 F.2d 901, 906 (6th Cir. 1991); *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007) (holding that the court "retains discretion to determine that a discovery request is too broad and oppressive").

## III. Analysis

The Court's inquiry starts at relevance and therefore must begin with the legal framework of the plaintiffs' causes of action. Title IX provides, in relevant part: "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20

U.S.C.A. § 1681(a). To allege a Title IX violation, it is not necessary to demonstrate "physical exclusion" from participation in or benefits from educational programs or activities. *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 651 (1999).

To succeed on a Title IX claim arising out of an incident of student-to-student harassment, a plaintiff must show that:

> (1) the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school, (2) the funding recipient had actual knowledge of the sexual harassment, and (3) the funding recipient was deliberately indifferent to the harassment.

*Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir. 1999) (citing *Davis*, 526 U.S. at 633 ).

Guidelines issued by the U.S. Department of Education Office of Civil Rights define sexual harassment as "unwelcome conduct of a sexual nature . . . [including] unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature." U.S. Dept. of Education Office of Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, § 1, https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html#II (hereinafter, OCR Guidelines).[3] Whether conduct rises to the level of actionable harassment "depends on a constellation of surrounding circumstances, expectations, and relationships." *Davis*, 526 U.S. at 652 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)). Factors to be considered include "the ages of the harasser and the victim and the number of individuals involved[.]" *Id.* Although it has not addressed the question authoritatively, in an unpublished opinion, the Sixth Circuit found that student-to-student conduct must be "unwelcome" to constitute sexual

---

[3] MNPS argues that the Court should not consider the OCR Guidelines as controlling law. Without deciding the Guidelines' appropriate weight, the Court references them as persuasive authority.

harassment. *Winzer v. Sch. Dist. for the City of Pontiac*, 105 F. App'x 679, 681 (6th Cir. 2004). Courts within the Sixth Circuit have found that certain types of sex-related bullying may be sufficiently severe to constitute sexual harassment, including circulating a nude photo of a student and ridiculing her with insults like "slut" and "whore," *Logan v. Sycamore Cmty. Sch. Bd. of Educ.*, No. 1:09-CV-00885, 2012 WL 2011037, at *5 (S.D. Ohio June 5, 2012); name-calling that referred to a student's genitalia, *Patterson v. Hudson Area Sch.*, No. 05-74439, 2010 WL 455410, at *3 (E.D. Mich. Feb. 3, 2010); and intimidation and ridicule in the wake of an alleged rape, *Doe v. Forest Hills Sch. Dist.*, No. 1:13-CV-428, 2015 WL 9906260, at *11 (W.D. Mich. Mar. 31, 2015).

"Deliberate indifference" requires a plaintiff to show that school administrators responded to student-to-student harassment in a way that was "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. A school cannot turn a blind eye to student-to-student behavior or conduct sub-par investigations and claim that the harassment was unknown. If school authorities knew or should have known about harassing conduct, the school's duty to respond under Title IX is triggered. *Forest Hills Sch. Dist.*, 2015 WL 9906260, at *11. Moreover, "Title IX imposes many duties on a school that must occur before a final investigation substantiates a complaint." *Id*.

When a student's Title IX claim arises out of an alleged incident of sexual harassment by a teacher, the plaintiff must show that "an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf [had] actual notice of, and [was] deliberately indifferent to, the teacher's misconduct." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998); *see also Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 366 (6th Cir. 2005). Because of the unique authority held by teachers in a school setting, courts diverge as to whether "unwelcomeness" is a necessary element of a teacher harassment

claim. *Compare Mary M. v. N. Lawrence Cmty. Sch. Corp.*, 131 F.3d 1220, 1225–27 (7th Cir. 1997) ("Welcomeness is an improper inquiry to be made in Title IX cases involving sexual discrimination of [children in kindergarten through eighth grade] . . . If [children of these ages] cannot be said to consent to sex in a criminal context, they similarly cannot be said to welcome it in a civil context. To find otherwise would be incongruous."), *with R.L.R. v. Prague Pub. Sch. Dist. I-103*, 838 F. Supp. 1526, 1534 (W.D. Okla. 1993) (finding that eighth-grade plaintiff failed to establish Title IX claim resulting from her relationship with school basketball coach because the parties agreed that the coach's advances were "not unwelcome," in spite of the fact that plaintiff lacked the legal capacity to consent under state criminal law). At a minimum, the OCR Guidelines advise, "[i]n cases involving secondary students, there will be a strong presumption that sexual conduct between an adult school employee and a student is not consensual." OCR Guidelines § V.A.2.

Title IX plaintiffs often bring parallel claims under § 1983 for violation of the Equal Protection Clause. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009). Here, the plaintiffs allege equal protection violations on grounds of MNPS' deliberate indifference to sexual harassment evidenced, in part, by a failure to adequately train its employees. To succeed on their § 1983 claims, the plaintiffs must show "that the municipality's policy or custom caused the alleged injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)). To prove failure to train, the plaintiffs must show that "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Id.* at 700; *see also City of Canton v. Harris*, 489 U.S. 378, 387 (1989); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th

Cir. 1992). To succeed on a deliberate indifference claim, the plaintiffs "must demonstrate . . . that the School District had actual knowledge of prior facts to which it responded *unreasonably*. A plaintiff must prove by a preponderance of the evidence that its response to the abuse, or lack thereof is *clearly unreasonable* in light of known circumstances," although "no one particular response is required." *Williams*, 400 F.3d at 364 (emphasis in original).

### A. Discovery of the Minor Plaintiffs' Sexual Histories

Central to the parties' motions is the question of whether MNPS may seek discovery of the minor plaintiffs' sexual histories. During Sally Doe's deposition,[4] MNPS asked Sally Doe if she knew whether her daughter had participated in sexual activity with her boyfriend or with "anyone previously, other than the incident [addressed by the litigation]." (Doc. No. 33-1, PageID# 273.) MNPS also asked Sally Doe whether her daughter used birth control "for the purposes of having sex," what Sally Doe taught her daughter about sex and sexual consent, whether her daughter had formal sexual education, what her daughter knew about Sally Doe's own sexual history, whether her daughter had ever seen pornography, whether her daughter had an OB/GYN, and whether she and her daughter had ever visited the Public Health Department or Planned Parenthood for any reason. (*Id.* at PageID# 273–79.)

Based upon this line of questioning and MNPS' stated intent to pursue similar questions with the minor plaintiffs, the plaintiffs now seek a protective order limiting MNPS' inquiry into the minor plaintiffs' sexual histories. The plaintiffs' counsel stated during oral argument that they do not object to MNPS questioning the students about any history they may have with the male

---

[4] Although the parties' arguments may refer to facts specific only to one action, the parties have agreed that the Court's resolution of the issues raised is relevant to and will control in all five related actions.

students involved in these incidents. Accordingly, the Court's analysis addresses only MNPS' proposed questioning regarding the minor plaintiffs' sexual histories with unrelated persons.

"'The scope of discovery under the Federal Rules of Civil Procedure is traditionally quite broad.'" *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 593 (6th Cir. 2014) (quoting *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998)). However, when a plaintiff asserts a claim of sexual harassment, the parameters of discovery have long been narrowed by the courts' interest in guarding against attempts to "harass, intimidate, and discourage the plaintiff in her efforts to prosecute her cause." *Priest v. Rotary*, 98 F.R.D. 755, 761 (N.D. Cal. 1983); *Mitchell v. Hutchings*, 116 F.R.D. 481, 483 (D. Utah 1987) ("Broad discovery has been coupled, however, with an array of protective orders designed to prevent discovery from being used as a tool of oppression rather than as a legitimate inquiry into relevant issues."). This balance is reflected in Federal Rule of Evidence 412, which bars the admission of "(1) evidence offered to prove that a victim engaged in other sexual behavior; or (2) evidence offered to prove a victim's sexual predisposition" in proceedings involving alleged sexual misconduct. Fed. R. Evid. 412. Rule 412 reflects a determination that "prior sexual activity is of dubious probative value and relevance and is highly embarrassing and prejudicial" and can be "used to harass the prosecuting victim." *Bell v. Harrison*, 670 F.2d 656, 658 (6th Cir. 1982). It "aims to safeguard the alleged victim against the invasion of privacy, potential embarrassment and sexual stereotyping that is associated with public disclosure of intimate sexual details and the infusion of sexual innuendo into the factfinding process." *Id*. In a civil case, evidence of past sexual conduct is admissible only if "its probative value substantially outweighs the danger of harm to any victim and of unfair prejudice to any party. The court may admit evidence of a victim's reputation only if the victim has placed it in controversy." Fed. R. Evid. 412(b)(2).

Although Rule 412 is an evidentiary rule that addresses admissibility, its advisory committee notes recognize that, "[i]n order not to undermine the rationale of Rule 412[,] . . . courts should enter appropriate orders pursuant to Fed. R. Civ. P. 26(c) to protect the victim against unwarranted inquiries and to ensure confidentiality." Fed. R. Evid. 412 advisory committee's note to 1994 amendment. To that end, the advisory committee notes direct that "[c]ourts should presumptively issue protective orders barring discovery unless the party seeking discovery makes a showing that the evidence sought to be discovered would be relevant under the facts and theories of the particular case, and cannot be obtained except through discovery." *Id.* Courts now routinely recognize that Rule 412 limits the scope of discovery into a litigant's sexual history in a civil action. *See Hulec v. J.H. Bennett & Co.*, No. 1:14-CV-00492, 2014 WL 3449514, at*1 (N.D. Ohio July 11, 2014) ("Evidence Rule 412 . . . limits the scope of discovery where the evidence sought deals with an alleged victim's past sexual conduct."); *Doe v. Willits Unified Sch. Dist.*, No. C-09-03655-JSW(DMR), 2010 WL 2524587, at *2 (N.D. Cal. June 23, 2010) ("[O]ne guiding principle in determining the proper scope of deposition questions in this case is that questions delving into plaintiff's sexual behavior or disposition should not be allowed absent an affirmative demonstration by defendants that the information sought is relevant to a claim or defense."); *Macklin v. Mendenhall*, 257 F.R.D. 596, 604 (E.D. Cal. 2009) ("Given the sensitive and potentially embarrassing nature of the information sought from Plaintiff, the fact that she is alleged to be a victim in civil action involving sexual harassment, and the policies voiced in the Advisory Comments to Fed. R. Evid. 412, the Court concludes that the fact that the information sought by Defendants from Plaintiff might be discoverable under Fed. R. Civ. Proc. 26(b) does not limit or absolve the Court of its responsibility to consider and fashion appropriate protective orders under Fed. R. Civ. Proc. 26(c)."); *Rhodes v. Motion Indus., Inc.*, No. 1:07-CV-251, 2008 WL 4646110,

at *3 (E.D. Tenn. Oct. 17, 2008) ("Although Rule 412 does not explicitly apply to discovery, it is 'applicable and has significance in deciding' certain discovery motions; namely, in deciding a discovery motion a court must be careful it does not undermine the rationale of the rule."); *Zakrzewska v. New Sch.*, No. 06 CIV. 5463 (LAK), 2008 WL 126594, at *2 (S.D.N.Y. Jan. 7, 2008) ("Courts quite properly are reluctant to permit discovery into . . . highly intimate matters. Individuals' privacy interests in such circumstances are important and deserving of protection. Moreover, there is a risk that permitting such discovery would deter some individuals from pursuing meritorious claims."). *But see Barnes v. Bd. of Educ.*, No. 2:06-CV-0532, 2007 WL 1236190, at *3 (S.D. Ohio Apr. 26, 2007) ("In the Court's view, Rule 412 does not change [the] result in this case . . . the Court notes that Rule 412 is a relevance rule that pertains specifically to the admission of evidence at trial.").

Considering the plaintiffs' motion for a protective order under Rule 26(c) in light of Rule 412's instruction, the Court's first determination is whether the minor plaintiffs' sexual histories are relevant to the claims and defenses raised in this case. MNPS asserts that this discovery is "extremely relevant" because the plaintiffs allege that the sexual contact and videoing at issue in this lawsuit was "unwanted" and "pressured" and that the minor plaintiffs suffered physical and emotional harm because of it. MNPS states that, "by alleging physical and emotional sexual trauma and developmental disorders creating damages of three million dollars, Plaintiff has placed [these] discovery topics in play." Accordingly, MNPS argues, information about the minor plaintiffs' sexual histories is "critical to this case, since a finding that the conduct was not unwanted could absolve Metro of all liability." MNPS "accepts that these questions are not easy to answer for any sixteen-year[-]old girl," but states that, because the plaintiffs have "come forward with these

explicit[] and sexual allegations already in a public lawsuit," they must provide the information necessary for MNPS to defend itself at trial.[5]

The logic supporting MNPS' theory of relevance—that a plaintiff's private sexual history has some bearing on whether unrelated sexual contact was wanted—is hollow, as many courts before this one have found. *See, e.g.*, *Wolak v. Spucci*, 217 F.3d 157, 160 (2d Cir. 2000) (holding that "[w]hether a sexual advance was welcome . . . does not turn on the private sexual behavior of the alleged victim"); *Hughes v. Twenty-First Century Fox, Inc.*, No. 17CV7093, 2018 WL 1936096, at *2–3 (S.D.N.Y. Apr. 24, 2018) (finding that a similar theory of relevance is "superficially appealing but advances a boorish, reductive narrative" of sexual predisposition); *Gowens v. Tidwell,* No. 10–10518, 2013 WL 2285446, at *3 (E.D. Mich. May 23, 2013) (noting that "the distress of sexual assault is rooted in the violation of one's body without consent and not in the number of sexual partners that a person has *chosen* by act of free will") (emphasis in original); *E.E.O.C. v. Donohue*, 746 F. Supp. 2d 662, 667 (W.D. Pa. 2010) (finding "insidious" the suggestion that plaintiff's past willingness to engage in private sexual banter was relevant to her reaction to such banter in the workplace); *Macklin*, 257 F.R.D. at 605 (finding relevancy of evidence regarding plaintiff's sexual conduct and social relationships "questionable"); *Williams v. Bd. of Cty. Comm'rs of Unified Gov't of Wyandotte Cty. & Kansas City*, 192 F.R.D. 698, 703–04 (D. Kan. 2000) (finding that inquiry into plaintiff's sexual history was of "marginal relevance" to claim regarding involuntary sexual encounter with police officer and presented "inordinate risk of

---

[5]     MNPS also argued that it must refute the minor plaintiffs' claim that they will not develop into healthy adults because of this conduct, which "puts Metro in the position where it will need to ask personal questions to see how [the minor plaintiffs have] developed sexually to this point in [their] lives." The plaintiffs have submitted a statement from their proposed expert that he does not intend to address developmental damages and will focus on "current psychological state, causation, treatment, and long term prognosis."

harm" to the plaintiff); *Truong v. Smith*, 183 F.R.D. 273, 275–76 (D. Colo. 1998) (finding evidence of plaintiff's "prior sexual activity with third parties has no bearing on the issue of whether she consented to the sexual violence charged").

It is now beyond question in the federal courts that "[t]he fact that the plaintiffs may welcome sexual advances from certain individuals has absolutely no bearing on the emotional trauma they may feel from sexual harassment that is unwelcome." *Mitchell*, 116 F.R.D. at 484. Simply put, sexual harassment is no less traumatic to a person who has had extensive experience with sex than it is to a person who has had none. To find otherwise would be to suggest that, once a person becomes sexually active, he or she welcomes sexual attention from all who might give it and is immune to the harm that results from unwanted sexual conduct. That line of reasoning has not been persuasive for decades. *See, e.g.*, *Howard v. Historic Tours of Am.*, 177 F.R.D. 48, 52 (D.D.C. 1997) ("Since a man cannot seriously contend in 1997 that any woman who has a sexual relationship with her co-worker is morally degraded . . . he is reduced to arguing that because a woman took one co-worker as a lover he is justified in his belief that she will accept him and welcome his sexual advances. That, in all but his imagination, is *non sequitur*."); *Mitchell*, 116 F.R.D. at 485 ("Past sexual conduct does not . . . create emotional calluses that lessen the impact of unwelcomed sexual harassment."). MNPS' argument has even less purchase when considered in the context of the plaintiffs' claims arising from the alleged incidents of exposing. Even if a plaintiff welcomed sexual contact, the conclusion that she also welcomed the videoing and broadcasting of that contact without her knowledge or consent is absurd.

In contrast to the minimal relevance of the information MNPS seeks, the potential for it to cause embarrassment, oppression, and undue burden is high. Fed. R. Civ. P. 26(c). Rule 412 was put in place, in part, "to reduce the inhibition women felt about pressing complaints concerning

sex harassment because of the shame and embarrassment of opening the door to an inquiry into the victim's sexual history." *Howard*, 177 F.R.D. at 51. Even before Rule 412, Rule 26(c) empowered courts to prevent discovery that could discourage plaintiffs from pursuing sexual harassment claims—"contraven[ing] the remedial effect intended by Congress in enacting Title VII." *Priest*, 98 F.R.D. at 762. Rule 26(c) affords courts the same power—and protects the same interests—in the context of Title IX litigation.

MNPS has not shown a purpose for discovery of the minor plaintiffs' sexual histories that overcomes the significant risk of harm presented. For that reason, the Court GRANTS the plaintiffs' motion for a protective order. MNPS may seek discovery regarding the minor plaintiffs' sexual histories only as they may relate to the perpetrators of the alleged assaults.

## B. Rule 35 Psychiatric Exams of the Minor Plaintiffs

MNPS asks the Court to order the minor plaintiffs to submit to psychiatric examinations by a medical examiner of its choice under Federal Rule of Civil Procedure 35. Rule 35 authorizes a court to "order a party whose mental or physical condition . . . is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner." Fed. R. Civ. P. 35(a)(1). The moving party must show "good cause" why the court should compel an examination. Fed. R. Civ. P. 35(a)(2).

Rule 35's "in controversy" and good-cause requirements are not "mere formalit[ies]," but "plainly expressed limitation[s] on the use of [the] Rule." *Schlagenhauf v. Holder*, 379 U.S. 104, 118 (1964). They require "affirmative showing[s] by the movant" as to why the examination is necessary and why the information sought could not be obtained through other means. *Id.* "Rule 35, therefore, requires discriminating application by the trial judge, who must decide, as an initial matter in every case, whether the party requesting a mental or physical examination or

examinations has adequately demonstrated the existence of the Rule's requirements[.]" *Id.* "This is because a more relaxed standard would allow parties to routinely compel each other to submit to examinations, which would be contrary to both the spirit of the Rules of Civil Procedure, *see* Fed. R. Civ. P. 1, and the purposes underlying the substantive law at the center of many disputes." *Winstead v. LaFayette Cnty. Bd. of Cnty. Comm'rs*, 315 F.R.D. 612, 614 (N.D. Fla. 2016). Close adherence to Rule 35's requirements is particularly necessary in the context of claims brought under anti-discrimination statutes, where the prospect of being required to undergo a physical or mental evaluation to vindicate protected rights might cause plaintiffs to abandon their claims. *Id.*

For this reason, courts are reluctant to find that a plaintiff places her mental condition "in controversy" simply by making a claim of emotional distress. *Johnson v. PPI Tech. Servs.*, L.P., No. CIV.A. 11-2773, 2013 WL 4508128, at *2 (E.D. La. Aug. 22, 2013). "'The majority of courts have held that plaintiffs do not place their mental condition in controversy merely by claiming damages for mental anguish or "garden variety" emotional distress.'" *Santifer v. Inergy Auto. Sys.*, LLC, No. 5:15-CV-11486, 2016 WL 1305221, at *2 (E.D. Mich. Apr. 4, 2016) (quoting *Gaines-Hanna v. Farmington Pub. Sch.*, No. 04-CV-74910-DT, 2006 WL 932074, at *8 (E.D. Mich. Apr. 7, 2006)) (additional citations omitted). "Garden variety" emotional distress has been defined to include "the generalized insult, hurt feelings and lingering resentment which anyone would be expected to feel if he or she were the recipient of an adverse . . . action attributed to discrimination." *Owens v. Sprint/United Mgmt. Co.*, 221 F.R.D. 657, 660 (D. Kan. 2004). Instead, the majority of courts will look for allegations of special circumstances that distinguish a case from more run-of-the-mill claims. Courts may find those special circumstances present when:

> (1) a tort claim is asserted for intentional infliction or negligent infliction of emotional distress; (2) an allegation of a specific mental or psychiatric injury or disorder is made; (3) a claim of unusually severe emotional distress is made; (4) plaintiff intends to offer expert testimony in support of a claim for emotional

> distress damages; and/or (5) plaintiff concedes that her mental health condition is
> in controversy within the meaning of Rule 35.

*Id*. (quoting *Stevenson v. Stanley Bostitch, Inc*., 201 F.R.D. 551, 554 (N.D. Ga. 2001)) (additional

citations omitted); *see also Hearring v. Sliwowski*, No. 3:10-0746, 2011 WL 3897803 (M.D. Tenn.

Sept. 6, 2011) (ordering Rule 35 mental exam after discovery deadline had passed where plaintiff

alleged "grievous mental suffering, including but not limited to post-traumatic stress disorder").

Also material to this determination is an "allegation of present, ongoing, or permanent mental

injury or disorder." *Bowen v. Parking Auth. of City of Camden*, 214 F.R.D. 188, 195 (D.N.J. 2003).

MNPS argues that the plaintiffs have placed the minor plaintiffs' mental conditions "in

controversy" by alleging that they have suffered severe emotional distress requiring medical care,

including "severe humiliation, embarrassment, loss of enjoyment of life, and loss of educational

opportunity," and by seeking three million dollars in damages for those injuries. (Doc. No. 27,

PageID# 200.) The plaintiffs have not alleged specific psychiatric injuries, although they do allege

that they are receiving medical treatment. The plaintiffs' characterization of their emotional

injuries does not necessarily place them in the realm of "unusually severe emotional distress." *See*

*Winstead*, 315 F.R.D. at 615 (finding that allegations of "emotional distress, mental pain and

suffering . . . mental anguish, [and] loss of enjoyment of life . . . are still inside the garden, though

they may be edging towards the gate"). However, the plaintiffs do allege that their emotional and

mental distress is ongoing and will require future treatment. The plaintiffs also state that they will

support their claims with expert testimony. These allegations—and the fact that the plaintiffs do

not argue they have *not* put their mental health in controversy—are a sufficient basis on which to

find that the plaintiffs' mental condition is sufficiently disputed for purposes of Rule 35's "in

controversy" requirement.

The Court must next determine if MNPS has shown "good cause" for the examinations by articulating "specific facts that demonstrate the need for the information sought and lack of means for obtaining it elsewhere." *Hill*, 229 F.R.D. at 568 (citing *Schlagenhauf*, 379 U.S. at 118). MNPS argues that a Rule 35 mental examination "is mandated by rights afforded to every litigant under the United States and Tennessee Constitutions." (*Id.* at PageID# 202.) It states that the plaintiffs "cannot be allowed to offer one-sided proof of [their] injuries and then refuse to allow the Metropolitan Government the opportunity to refute that proof." (*Id.*) Citing authority that addresses the right of criminal defendants to present exculpatory proof at trial, MNPS argues that "[t]here is no legitimate state interest in denying Metro an opportunity for a full presentation of the issues at trial, and such a one-sided process serves as a violation of its rights to due process." (*Id.*)

By MNPS' reasoning, a Rule 35 examination would be appropriate in any case in which the plaintiff alleged physical or emotional harm, obviating the need for the Rule's "in controversy" and "good cause" requirements or any "discriminating application" of its terms by the Court. *Schlagenhauf*, 379 U.S. at 121–22 (noting that, although the Rules should be "liberally construed . . . they should not be expanded by disregarding plainly expressed limitations"). Rule 35 plainly does not support such a broad application. Allowing routine authorizing of physical and mental examinations is the "untoward result" *Schlagenhauf* found that Rule 35's plain language guards against. *Id.* at 122.

What does establish good cause and authorizes a Rule 35 examination in this case is the plaintiffs' stated intent to prove their emotional injuries with the testimony of a retained expert. *Winstead*, 315 F.R.D. at 616 n.3 (citing "near-universal agreement" on this point); *Duncan v. Upjohn Co.*, 155 F.R.D. 23, 26 (D. Conn. 1994) ("The plaintiff intends to prove his claim at trial

through the testimony of his own expert witness, which also constitutes good cause for permitting the defendant to conduct its own psychiatric examination of the plaintiff."); *Tomlin v. Holecek*, 150 F.R.D. 628, 630 (D. Minn. 1993) (finding good cause in plaintiff's "stated intent to prove [his claim of psychological injury] through the elicitation of expert psychological testimony"). As the *Winstead* court noted, there is a distinction between a plaintiff who seeks treatment for emotional harm and should not be punished for doing so and a plaintiff who elects to be examined by an expert to support her litigation position. *Winstead*, 315 F.R.D. at 616 n.3. In the latter circumstance, "[f]orcing such a plaintiff to submit to a similar examination conducted by a different expert . . . is not a punishment, but a leveling of the playing field." *Id.*

Accordingly, the Court GRANTS MNPS' motion to take Rule 35 examinations of the plaintiffs. The plaintiffs argue that a Rule 35 examination by MNPS' expert cannot be used as an "end run" around the Court's limitations on discovery of the plaintiffs' sexual histories. (Doc. No. 29, PageID# 209.) The Court agrees. The terms of the protective order entered regarding discovery of the plaintiffs' sexual histories shall apply to the examinations conducted by either party's expert. The examinations shall be taken in Nashville at a date and location mutually convenient to the parties.

### C. Discovery of the Adult Plaintiffs' Employment, Health, and Financial Records

In Sally Doe's deposition, MNPS pursued a line of questioning regarding her financial status. The plaintiffs seek a protective order against this line of inquiry on grounds that MNPS seeks to dissuade the parents from appearing in court by requiring them to reveal private financial information. The plaintiffs also argue that this information is not relevant to any claim or defense because the adult plaintiffs have "no independent claims of [their] own, and [their] . . . financial

situation [does not] bear even a remote relationship to the facts in this case nor claims of the victim[s]."

MNPS responds that the adult plaintiffs' financial status is "incredibly relevant to their motivation for bringing claims on their children's behalf," arguing that the adult plaintiffs have a "financial stake" in the litigation. MNPS further argues that the adult plaintiffs' "financial standing . . . is also relevant to the issue of [the minor plaintiffs'] mental health and development." In the hearing, MNPS argued that this information is necessary because some of the trauma the minor plaintiffs have experienced may be attributable to poverty and not to the sexual harassment they allege. To find otherwise, MNPS states, would be "to suggest [the minor plaintiffs] grew up in a vacuum." Weighing the relevance of the requested information against the burden of its production, the Court finds that that the balance tips in favor of protecting the adult plaintiffs from this discovery.

MNPS' theory that it must know the adult plaintiffs' financial status to determine if the minor plaintiffs have suffered emotional harm is based on a false equivalence between poverty and trauma. Certainly, the collateral consequences of poverty may cause trauma to children who experience them. *See, e.g.*, *P.P. v. Compton Unified Sch. Dist.*, No. CV153726MWFPLAX, 2015 WL 5752770, at *1 (C.D. Cal. Sept. 29, 2015) (describing trauma experienced by children who grow up in high-poverty neighborhoods as stemming from "exposure to violence and loss, family disruptions related to deportation, incarceration and/or the foster system, systemic racism and discrimination, and the extreme stress of lacking basic necessities, such as not knowing where the next meal will come from or where to sleep that night"). MNPS' psychological expert may explore such specific sources of emotional injury with the minor plaintiffs in the Rule 35 examinations. But there is little to be learned about a child's trauma from her parent's bank statement. Nor, surely,

is there any argument that children who experience poverty are hardened to sexual harassment or less deserving of redress when they experience it.

That leaves MNPS' argument that the parents' financial status is relevant to their motivation in bringing these lawsuits on their children's behalf. However, "[i]t is well-established that in ordinary litigation . . . the plaintiff's motive in bringing suit is not relevant to the subject matter of the litigation and is not a matter for discovery." *Parsons v. Jefferson-Pilot Corp.*, 141 F.R.D. 408, 414 (M.D.N.C. 1992); *see also Rayfield Aviation, LLC v. Lyon Aviation, Inc.*, No. 1:11CV274, 2012 WL 3095332, at *2 (M.D.N.C. July 30, 2012) (finding motive for a suit is not relevant to the claims raised in the case); *Digital Equip. Corp. v. Sys. Indus., Inc.*, 108 F.R.D. 742, 743 (D. Mass. 1986) (collecting cases in which "the motive behind the institution of the action was deemed not relevant to the subject matter involved pursuant to Fed. R. Civ. P. 26(b)); *Foremost Promotions, Inc. v. Pabst Brewing Co.*, 15 F.R.D. 128, 130 (N.D. Ill. 1953) ("It is difficult to see how an inquiry into the circumstances surrounding the instigation of the action could affect the substance of the claim."). MNPS does not allege any defense to which this information would be relevant. *See Parsons*, 141 F.R.D. at 415 (finding that motive may be relevant to unclean hands defense if it has "an immediate and necessary relation" to the transaction at issue). The Court therefore finds that discovery of the adult plaintiffs' financial status is not relevant to the subject of this litigation.

Because MNPS has not articulated a theory of relevance that would make the parents' financial health a proper subject of discovery, the plaintiffs' motion for a protective order against this line of questioning is GRANTED.[6]

---

[6]    Because the Court finds the information sought during Sally Doe's deposition not relevant, MNPS' motion to reopen her deposition is now moot. However, the Court notes that the instruction of plaintiffs' counsel to Sally Doe not to answer questions related to her financial health in her

### D. Discovery of MNPS Investigative Files[7]

The plaintiffs seek to discover "investigative files and disciplinary records for events involving sexual harassment, sexual pictures and videos, and other inappropriate sexual behavior that occurred at [MNPS] secondary schools." The plaintiffs argue that, to prove that MNPS has been deliberately indifferent to harassment, they must show that MNPS has responded to known circumstances in an unreasonable manner. Whether MNPS had notice of other incidents of sexual harassment in its schools and how it responded, they argue, is relevant to that element of their claims. MNPS argues, in response, that evidence as to how it addressed incidents of sexual misconduct not involving these minor plaintiffs is not relevant in this litigation. MNPS further argues that producing these files would be overly burdensome.

The plaintiffs cite *Vance v. Spencer County Public School District*, 231 F.3d 253 (2000), in support of their position. In *Vance*, the Sixth Circuit held that, "[w]here a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of known circumstances." *Vance*, 231 F.3d at 261. MNPS argues that *Vance* stands only for the proposition that "evidence of previous sexual misconduct at school ***against the same plaintiff*** could be relevant to determining whether the school's previous remedial actions were so ineffective to curb harassment against that plaintiff" and terms it "a logical leap" to suggest that *Vance* makes MNPS' response to unrelated incidents relevant to the plaintiffs' claims.

---

deposition was not appropriate under Rule 30(c)(2), which allows counsel to instruct a deponent not to answer only when privilege is invoked. Fed. R. Civ. P. 30(c)(2).

[7]  In the parties joint motion, the plaintiffs state that they are also seeking records from the Metropolitan Nashville Police Department. In the Court's hearing, the plaintiffs clarified that they are only seeking MNPS records.

This Court has previously grappled with the reach of *Vance* and other Sixth Circuit decisions regarding a Title IX funding recipient's knowledge of prior acts of harassment in determining liability. *See Doe*, 186 F. Supp. 3d at 805–06; *Lopez v. Metro. Gov't of Nashville and Davidson Cnty.*, 646 F. Supp. 2d 891, 915 (M.D. Tenn. 2009). In *Lopez*, the Court found that Title IX liability is not limited "to a federal education funding recipient's knowledge of, and deliberate indifference to, the alleged harassment of a *particular individual*, but instead . . . Title IX claims could be based on the recipient's knowledge of, and deliberate indifference to, a *particular harasser's* conduct in general." *Lopez*, 646 F. Supp. 2d at 916 (emphasis in original) (quoting *Staehling v. Metro. Gov't of Nashville and Davidson Cty.*, No. 3:07-0797, 2008 WL 4279839, at *10 (M.D. Tenn. Sept. 12, 2008)). In *Doe v. University of Tennessee*, the Court drew upon *Lopez* and *Staehling* to find that that the plaintiffs had stated a viable Title IX claim based on allegations that the defendant university had knowledge of prior harassment, not by a specific individual, but by a particular group of students. *Doe*, 186 F. Supp. 3d at 806 (finding adequate allegations that the university "had actual knowledge of prior incidents of sexual assault by UT football and basketball players that were sufficient to put UT on notice of the risk to the plaintiffs, yet UT was deliberately indifferent in facility to adequately address this risk, including failing to change its remedial measures which were not effective"). The Court also found that liability could arise from the university's "handling [of] athlete discipline . . . and lack of sexual harassment training," among other policies. *Id.* at 807.

Here, the plaintiffs allege that MNPS created an environment that was hostile to female students by failing to train its employees, allowing improper sexual conduct among students to take place, failing to impose adequate disciplinary measures for that improper sexual conduct, and failing to take action to address a system-wide practice of exposing. The records that the plaintiffs'

seek are relevant to those allegations and to showing what, if any, improper conduct was known to MNPS before the plaintiffs experienced the harm they now allege and how MNPS responded to it. It will ultimately fall to the plaintiffs to show that any prior incidents are sufficiently tied to their claims as to give rise to MNPS' liability but, at this juncture, the records of prior disciplinary incidents are discoverable.

Since the Court's hearing, MNPS has determined that producing these records will not be as burdensome as it once imagined. After performing a keyword search of its disciplinary incident database, MNPS states that it is prepared to manually redact and produce up to 1,000 identified records. If the plaintiffs seek more than 1,000 records, MNPS asks that the cost of redaction be shared. Because the parties have not had an opportunity to consult as to the relevant search terms or the breadth of relevant discovery, the Court ORDERS the parties to meet and confer to agree upon search terms and to determine the number of records those terms will identify. The parties shall also address any cost sharing in their conference. If they are unable to resolve that issue, MNPS may raise it in a telephone conference with the Magistrate Judge.

### E. Discovery of the Minor Plaintiffs' Social Media Profiles

MNPS asks the plaintiffs to identify the social media platforms that they use and their usernames on each platform and to produce all information related to contacts with the alleged perpetrators and witnesses, the plaintiffs' alleged injuries, and "harassment, threats or distribution of the video that is the subject of the case." MNPS also seeks "all pictures or videos taken since the beginning of the calendar year in which the incident occurred" and a downloaded copy of the plaintiffs' social media accounts in full. The plaintiffs respond that MNPS' request for all of the content of their social media accounts is overbroad because it would allow MNPS access to non-public information without limitation.

There is a distinction between discovery of social media postings that are available to the general public and those that the user has restricted from view. "[I]nformation posted on a private individual's social media 'is generally not privileged, nor is it protected by common law or civil law notions of privacy.'" *Potts v. Dollar Tree Stores, Inc.*, No. 3:11-CV-01180, 2013 WL 1176504, at *3 (M.D. Tenn. Mar. 20, 2013) (quoting *Tompkins v. Detroit Metro. Airport*, 278 F.R.D. 387, 388 (E.D. Mich. 2012)). However, a party does not have "a generalized right to rummage at will through information that [an opposing party] has limited from public view." *Id.*; *see also Howell v. Buckeye Ranch, Inc.*, No. 2:11–CV–1014, 2012 WL 5265170, at *2 (S.D. Ohio Oct. 1, 2012) ("The fact that the information defendants seek is in an electronic file as opposed to a file cabinet does not give them the right to rummage through the entire file."). To obtain discovery of non-public social media, a party must show that the information sought is reasonably calculated to be relevant to the claims and defenses in the litigation. *See, e.g.*, *Doe v. Rutherford Cty., Tenn., Bd. of Educ.*, No. 3:13-0328, 2014 WL 4080159, at *2 (M.D. Tenn. Aug. 18, 2014); *Holder v. AT&T Servs., Inc.*, No. 3:11-0076, 2013 WL 5817575, at *3 (M.D. Tenn. Oct. 29, 2013); *Potts*, 2013 WL 1176504, at *3.

The production of a social media account's contents in full will therefore rarely be appropriate. Every relevant communication may be buried in a thicket of unrelated musings, "likes," gifs, selfies, and emoticons that are not appropriately discovered. Nor does the fact that a plaintiff's mental or emotional state is at issue automatically justify sweeping discovery of social media content. *See Giacchetto v. Patchogue-Medford Union Free Sch. Dist.*, 293 F.R.D. 112, 115 (E.D.N.Y. 2013); *Johnson*, 2013 WL 4508128, at *2; *Rozell v. Ross-Holst*, No. 05 CIV. 2936(JGK)JCF, 2006 WL 163143, at *3 (S.D.N.Y. Jan. 20, 2006). Social media may make a daily record of a party's thoughts and feelings available at the click of a mouse (or at least those thoughts

and feelings the party determines are worthy of sharing with a virtual community of "friends"). But just as "[n]o court would have allowed unlimited depositions of every friend, social acquaintance, co-employee or relative of a plaintiff to inquire as to all disclosures, conversations or observations," the party seeking to discover those thoughts and feelings via social media must still make a showing of relevance and proportionality to the claims of the litigation. *Gordon v. T.G.R. Logistics, Inc.*, 321 F.R.D. 401, 403 (D. Wyo. 2017); *see also Giacchetto*, 293 F.R.D. at 116; *Reid v. Ingerman Smith LLP*, No. CV 2012-0307 ILG MDG, 2012 WL 6720752, at *2–3 (E.D.N.Y. Dec. 27, 2012); *E.E.O.C. v. Simply Storage Mgmt., LLC*, 270 F.R.D. 430, 430 (S.D. Ind. 2010).

The plaintiffs concede that MNPS may discover their publically available social media postings, and so the plaintiffs are ORDERED to identify all social media platforms they use and their usernames on each platform so that MNPS may access their public postings. With regard to non-public information, the plaintiffs have agreed to produce all private social-media communications regarding the incidents that form the basis of their claims, except those covered by privilege. Because the plaintiffs allege ongoing harassment, MNPS states that it also seeks information regarding any harassment that the plaintiffs experienced after the alleged incidents and any harassment taking place up to two months before the alleged incidents occurred. The Court finds that these proposed limits sufficiently narrow the scope of discovery to information relevant to the plaintiffs' claims. The plaintiffs are therefore ORDERED to produce all non-public social media content regarding the alleged incidents of harassment and any harassment taking place from two months before the incidents alleged in each plaintiff's complaint to the present.

### F. MNPS' Interviews of Students During the School Day

The plaintiffs seek supplemental discovery regarding several incidents in which they allege MNPS lawyers called potential student witnesses to the principal's office during the school day and interviewed them regarding this litigation without notifying their parents. The plaintiffs argue that this practice may unduly coerce minor students into being interviewed against their will, and that this may violate the targeted students' constitutional protections. *See Williams v. County of San Diego*, No. 17CV815-MMA (JLB), 2017 WL 6541251, at *6 (S.D. Cal. Dec. 21, 2017) (finding, in the context of abuse and neglect proceedings, that a social worker "interviewing minors at school without parental consent can violate constitutional rights") (collecting cases). The plaintiffs' motion seeks "full disclosure pertaining to what Metro [L]egal is doing with the student witnesses and what authority they have to pull the students from class without the consent of their parents and compel them to sit for a private interview with Metro [L]egal."

By affidavit, MNPS states that, in an interview apparently taking place under these circumstances, counsel asked the student if he was Sally Doe's boyfriend to determine if he was the plaintiffs' witness and if the plaintiffs' counsel should be contacted to set up a deposition and for his parent's contact information to use in setting up an interview or deposition. (Doc. No. 36, PageID# 250.) MNPS now proposes that it be able to obtain contact information for student witnesses from MNPS databases and to contact the students' parents or guardians to request an interview. If the parent or guardian declines, MNPS states that it will issue a subpoena with notice to opposing counsel. Any student witness may be accompanied by a parent or guardian in an interview or deposition. (Doc. No. 41, PageID# 281.) MNPS will provide contact information to the plaintiffs for any student witnesses they wish to interview "after FERPA notices have been sent." (*Id.* at PageID# 281 n.1.)

It is not apparent from the plaintiffs' motion that they sought the discovery they now request from MNPS before bringing the issue to the Court's attention or that the parties have met and conferred regarding this issue or MNPS' proposed solution. Accordingly, the parties are ORDERED to meet and confer regarding the plaintiffs' request for information and MNPS' proposed procedure for interviewing student witnesses. If any issues remain for the Court's determination after the parties' meeting, the parties may raise them in a telephone conference with the Magistrate Judge.

### G. Order Authorizing Release of the Minor Plaintiffs' Medical Records

Finally, MNPS asks the Court to enter an order that would authorize it to obtain the minor plaintiffs' medical records from any medical provider to whom it is produced. The proposed order requires that notice be given to the plaintiffs' counsel and does not permit *ex parte* communications between the plaintiffs' health care providers and MNPS' counsel. The proposed order also contains a protective order limiting to whom the produced information may be disclosed. The plaintiffs oppose entry of this order on grounds that MNPS has been able to obtain the medical records it needs through releases executed by the plaintiffs and subpoenas.

The origin of this dispute appears to be trouble MNPS encountered in obtaining records from Centerstone, a mental health provider, which required a more comprehensive release form than what the plaintiffs had provided. Instead of executing the required release for MNPS, the plaintiffs' counsel obtained the records and produced them to MNPS. MNPS argues that the plaintiffs cannot be the custodians of their own records and that MNPS should be able to obtain its own copy of the records directly from the provider.

The Court finds that MNPS has articulated sufficient grounds for access to the minor plaintiffs' medical records; however, the requested blanket release order is a broader remedy than

what the circumstances require. Accordingly, the motion is GRANTED IN PART AND DENIED IN PART. The plaintiffs are ORDERED to execute the necessary release for MNPS to obtain medical records directly from Centerstone and any other provider from whom they seek records, if the plaintiffs do not object to production of the records on other grounds. The parties may negotiate the terms of a protective order as necessary to prevent unnecessary disclosure of the plaintiffs' health information.

## IV.    Conclusion

For the foregoing reasons, MNPS' motion to take Rule 35 psychiatric examinations is GRANTED, subject to the limitations detailed above; MNPS' motion for an order authorizing release of the minor plaintiffs' medical records is GRANTED IN PART AND DENIED IN PART; the plaintiffs' supplemental motion for discovery regarding MNPS' contact with student witnesses is DENIED WITHOUT PREJUDICE to renewal; the parties' joint motion for resolution of multiple discovery issues is GRANTED IN PART AND DENIED IN PART, as set out in the Court's opinion; and MNPS' motion to expedite a ruling on the discovery issues is FOUND MOOT.

It is so ORDERED.


Alistair D. Newbern
U.S. Magistrate Judge